## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THOMAS ALBERT,**

     **Petitioner,**

                                **CASE NO. 2:07-CV-929**
     **v.**                           **JUDGE MARBLEY**
                                **MAGISTRATE JUDGE KING**

**MICHAEL SHEETS, Warden,**

     **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the petition, respondent's return of writ, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On March 4, 2005, the Franklin County Grand Jury indicted appellant on one count of rape in violation of R.C. 2907.02, a felony of the first degree, and one count of abduction in violation of R.C. 2905.02, a felony of the first degree. The charges arose from his alleged rape and abduction of a female victim ("the victim") on November 5, 2004.
>
> On October 11, 2005, appellant moved to suppress the use of the following as evidence against him: testimony concerning identification; testimony of police officers and a civilian witness concerning the photo identification procedure used and the identification obtained; and any in-court identification testimony. In particular, appellant argued that the photo array

was unnecessarily suggestive and conducive to irreparable mistaken identification. Plaintiff-appellee, State of Ohio ("appellee"), opposed the motion.

On January 11, 2006, the court held a hearing on the motion to suppress. Columbus Police Detective Eric Wooten testified concerning his interview with the victim. The transcript reflects the following, in pertinent part:

Q. [BY APPELLEE'S COUNSEL] When you spoke with [the victim] was she able to give you a description of the person that she said had attacked her?

A. Yes.

Q. What kinds of information did she give you in that in terms of identification?

A. She described him as a male black, 25 years of age, bald head, 225 to 250 pounds, five foot nine to five foot eleven driving a white old box-style police car, police looking car.

* * *

Q. Did she give you any other kind of information that might help you identify the person?

A. Yes. A cell phone number.

Q. And how about a name?

A. Yes. Thomas Alfred.

(Vol. I Tr. ["Tr."] at 8-9.)

Detective Wooten was not able to locate a "Thomas Alfred." However, through the cell phone number given by the victim, he contacted the cell phone company and obtained the name and address of the owner of that number. When Detective Wooten went to the address, he observed a "white box-style vehicle" in front. (Tr. at 10.) Also, the male who answered the door of the address fit the physical description the victim had provided. Detective Wooten then made an in-court identification of appellant as the person who answered the door.

Detective Wooten testified further that appellant had not identified himself when Detective Wooten initially spoke to him. Detective Wooten questioned appellant about the car. Appellant told Detective Wooten that the car belonged to his cousin, but he would not identify the cousin. Upon obtaining the license number of the car, Detective Wooten determined that it was registered to "Thomas Albert." He also obtained a picture of the owner, and the picture matched the physical description provided by the victim.

Detective Wooten then entered general descriptors matching those given by the victim into a law enforcement identification system, obtained a computer-generated selection of photographs of individuals meeting those descriptors, and created an array of six photographs, which included a photo of appellant. He showed the array to the victim and read the following form statement to her:

The photo array you are about to view consists of six photographs in no particular order of importance. The subject of the investigation may or may not be included in the photographs. Look carefully at the photographs of all six, then advise the detective whether or not you recognize anyone. You are not required to select any of the photographs.

(Tr. at 16-17.)

The victim viewed the photos, and she selected appellant within "a couple seconds." (Tr. at 19.) She stated that she "was very certain" about the identification. (Tr. at 19.)

On cross-examination, Detective Wooten acknowledged that the victim's report and his first contact with appellant occurred in November 2004, but that he did not show the photo array to the victim until January 2005. Detective Wooten did not agree that an identification closer in time to the incident would have been more reliable. Detective Wooten also stated that he gave the victim information about his investigation, but did so only after she made the identification. Specifically, he testified that he told her he had traced the cell phone number she had given him, obtained appellant's name and address, spoken with appellant at the address, and observed a car matching the description she had given him. Detective Wooten stated that he might have told her about appellant's record, but he could not be sure.

Following the detective's testimony, appellee argued that the victim's identification of appellant was not suggestive. In response, appellant's counsel focused on three issues. First, counsel argued that the photos were black and white. According to counsel, the victim had told the officer who received her initial report that the assailant was light-skinned. The fact that the photos did not depict skin tone was "a very important factor." (Tr. at 27.)

Second, counsel argued that the victim viewed the photos more than two months after the alleged attack. That two-month delay had an impact on the reliability of the victim's identification.

Third, defense counsel took issue with Detective Wooten's disclosures to the victim. Those disclosures, in counsel's view, reinforced the victim's selection and basically indicated "you picked the right person[.]" (Tr. at 28.) That reinforcement, he argued, would taint any in-court identification of appellant by the victim.

The court denied appellant's motion to suppress. The court found, first, that the identification procedure with respect to the photo array was "entirely appropriate and there is no positive constitutional violation in that regard." (Tr. at 29.) The court also concluded that the detective's disclosures would not unnecessarily affect any in-court identification by the victim.

A jury trial commenced on January 12, 2006. Columbus Police Officer Richard Mays testified on behalf of appellee. He stated that he responded to a call made at approximately 7:30 a.m., on November 6, 2004. The call was from John Arnold, who stated he was calling on behalf of the victim. Officer Mays arrived at Arnold's home to speak with the victim. The transcript reflects the following:

Q. And you mentioned that he was calling on behalf of [the victim] but she was difficult to speak to. Why was that?

A. She was kind of hysterical in her behavior. She was-she wouldn't quit shaking, her hands were shaking, her face was shaking. She kept clenching her hands. She was crying. She was difficult to talk to and it was hard to get, you know, if she knew where she was at, she did, but she didn't know how she got there and then we kind of had to back, go forward, back, go forward so I could get all the information from her.

Q. Did you observe any injuries on her body?

A. She had a cut between her eyes on the top of her nose.

Q. When you started to talk to her was she still in this kind of hysterical or upset state?

A. Yeah. She was-it took me probably 10, 15 minutes to get to the point where I could get from her to understand what was going on.

(Tr. at 57.)

Following this testimony, appellee's counsel asked Officer Mays: "What did she tell you had occurred?" (Tr. at 57.) Appellant's counsel objected to the question on grounds of hearsay; appellee's counsel responded that the testimony regarding what the victim told Officer Mays was not hearsay because it fell within the excited utterance exception to the hearsay rule. The court overruled the objection, stating: "To the extent that what she's saying is an excited utterance that would be overruled." (Tr. at 58.) Appellant's counsel also objected to the testimony based on *Crawford v. Washington* (2004), 541 U.S. 36; the court overruled the objection.

Officer Mays testified that the victim stated she had been sexually assaulted at a Motel 6. She had met a man named "Thomas" on November 4, and she had gone to the movies with him on the evening of November 5. She gave his cell phone number, a description of him, and a description of his car. She also "said he was a light skinned male black." (Tr. at 61.) While giving these statements, Officer Mays testified, the victim was "still pretty hysterical." (Tr. at 64.) After he finished speaking with the victim, he took her to Grant Hospital.

The victim then testified. She stated that she was 17 years old in November 2004, when she was a junior in high school. She testified that she met a man named "Thomas" on November 4, 2004, when he stopped his car to talk with her while she was walking in her neighborhood. She got into his car and "went on an errand with him." (Tr. at 69.) She made an in-court identification of appellant as the man she met that day.

When they finished with the errands, the man took her home, and they exchanged phone numbers. The following day, the victim called him from school at approximately 11:00 a.m., and he picked her up from school. According to the victim, she accompanied him to a local college, where he had to take a test, and she waited for him. She also stated that her cousin attended the same college. Appellant took her home before

dinner.

Later that day, the victim called appellant again. She stated that "he said he wanted to go take me to the movies and chill and drink and smoke a little bit." (Tr. at 73.) He picked her up that evening in the same car she had described, and they saw a movie. After the movie, he asked her if she wanted to go to a motel, and she agreed.

In the motel room, the victim testified, she and appellant talked and watched television. Appellant asked if he could perform oral sex on her, and she refused "because he'd want sex and I didn't want to have sex with him." (Tr. at 79.) Eventually, however, appellant convinced her that "he didn't want to have sex[,]" and he performed oral sex on her. (Tr. at 80.) The victim then testified to the following:

Q. What happened after you let him perform oral sex on you?

A. He started to unbuckle his pants.

Q. Did you say anything when he did that?

A. Yes. I said what are you doing, I told you I didn't want to do that.

Q. What did he say?

A. He just was trying to talk me into it like come on and I was like no.

Q. Do you know how many times you told him no?

A. Probably two or three.

Q. What happened after you told him no two or three times?

A. He got mad.

Q. How did you know he got mad?

A. Because he started like more force like more strength when he was touching me on my arms and stuff. And I asked him like what are you about to rape me or something and he said yes.

(Tr. at 81-82.)

The victim also testified that appellant held her down. When she screamed, "he punched me in my nose." (Tr. at 82.) Her "nose was broken" and it bled. (Tr. at 82.) When she screamed louder, he choked her. At that point, the victim testified: "I told him if he wanted to do it, he could go ahead, just put on a condom." (Tr. at 83.) According to the victim, appellant put on a condom and raped her.

Afterwards, appellant took the victim's cell phone, tied his shirt around her face, and led her to his car. He made her "get in the car and he told [her] he had a gun." (Tr. at 85.) He then drove her to a neighborhood where she had never been before, walked her to the side of a house, and told her to stand there and not move. After he left, she removed the shirt. She started knocking on doors until she was able to use someone's phone. She called John Arnold, who came to get her and took her to his house.

At Arnold's house, she spoke with police. She went to Grant Hospital, where she received care for the injury to her nose. She also went to Riverside Hospital, where they gave her a rape kit, took pictures of her, and took some of her clothes. Appellee's counsel also produced the shirt that had been over her face; the shirt, the victim testified, was appellant's shirt.

The victim also testified regarding her discussion with

Detective Wooten and the photo array. She confirmed that this was "a couple months" after the incident. (Tr. at 94.) The transcript reflects the following:

Q. Now, did the detective tell you who to point out or did you have to pick?

A. I had to pick.

Q. Did the detective tell you anything about any of the people in the pictures when he gave it to you?

A. No. He just said look at them and pick out who did that to you.

Q. Did you find anybody in there?

A. Yes.

Q. Who did you pick?

A. [Appellant].

(Tr. at 95.)

The victim confirmed that the man she referred to as "Thomas" - the man who raped her - was appellant.

On cross-examination, the victim recalled that she and appellant met another man when she got into his car on November 4, and she recalled that appellant dropped her off about a block from her house, not at her house, that day. She also confirmed that she accompanied appellant to a college she believed to be Central State College. While there, she called her cousin, who met her there and met appellant.

9

The victim also admitted that she agreed to go to the motel with appellant "to watch TV and drink and smoke * * * a little weed[.]" (Tr. at 107.) Appellant gave her the money to buy the "weed," which she bought from a friend of hers. Defense counsel also questioned the victim extensively regarding the location of the Motel 6.

As to what happened inside the motel room, the victim admitted that she asked to wear appellant's shirt, that she got under the covers of the bed, and that she took her own underwear off. She also stated that she was out past her curfew and that her mother would be angry with her for that.

Finally, appellant's counsel asked her about the home where she was able to call her friend, John Arnold. According to the victim, the people at this house asked if she wanted them to call the police; she said no, and she never told them she had been raped. She stated that she waited there "about 20 or 30 minutes" before Arnold arrived. (Tr. at 119.)

James Sinclair testified on behalf of appellee. He stated that he, his wife, and his father-in-law were living in a home on Glenchester Drive in Franklin County on November 6, 2004. At about 3:30 or 4:00 that morning, a girl arrived at their door. She had blood on her and a cut near her nose. According to Sinclair, "[s]he was acting definitely dazed or stunned, quiet." (Tr. at 125.) The transcript also reflects the following:

Q. What, if anything, did she do when she was inside your house?

A. She came in, she sat down and basically she sat there, we asked her if she was okay. She didn't really respond. I think she said yes. And then she asked to use the phone and I gave her my cell phone.

Q. Did she use the cell phone?

A. She had a hard time using the cell phone so I went ahead and dialed and I talked to the person on the other end.

(Tr. at 126-127.)

Sinclair stated that the girl was at their home for 30 to 45 minutes. On cross-examination, he confirmed the location of his home, which is close to the Franklin County line.

At this point in the proceeding, the court held a discussion, on the record, with a juror. We address that discussion in our consideration of appellant's third assignment of error, below, and will not do so here.

Kathy Malthouse, a nurse at Riverside Hospital, testified for appellee as an expert in forensic sexual assault examinations. Malthouse confirmed that she examined the victim on November 6, 2004. Malthouse described the victim as "being nervous, looking frightened, but she was quiet, she was calm, she was very cooperative." (Tr. at 158.) She gave the following account of what the victim told her:

She reported that she had been at a local motel, didn't recall where, was watching TV. She was asked to perform oral sex and she says no. And then later said yes. Was asked to have intercourse, she said no. She attempted to getting [sic] into the bathroom, she was punched in the face, in the nose area with the fist, choked at her neck. She said in her report to me she said she told this person that she wouldn't go to the police if he would just let her go. Her T-shirt was pulled up over her head. She was taken in the car and dropped off somewhere. She was told to count to 50, he drove away apparently taking her cell phone. He stated to her that he had a gun but she tells me she didn't see one. She denied being knocked out. * * * She went to a door, knocked on a door, used a phone, called a friend named John, was taken to his house and from there she phoned the police. And then was taken to the emergency department at Grant.

(Tr. at 159-160.)

With questioning from appellee's counsel, Malthouse corrected her reference to the victim performing oral sex and stated: "He asked her if he could perform oral sex on her." (Tr. at 161.) Regarding her reference to "[h]er T-shirt[,]" Malthouse also stated: "He put a T-shirt over her head is what I have written here." *Id.*

As a result of her examination of the victim, Malthouse found that the victim had an injury to her nose. She also stated that there were "red marks" and "some swelling" on the victim's neck. (Tr. at 162.) She also determined that the victim's physical injuries were consistent with the victim's account of what had happened.

Malthouse gave a detailed description of the clothing collected. She also testified regarding the exams and collection procedures she performed. Although she found no injuries to the victim's genital area, she testified that such a finding is not unusual. However, on cross-examination, Malthouse confirmed that a lack of internal injuries could be consistent with consensual sex. She also stated that she had not swabbed for saliva, even though the victim reported that the man had licked various parts of her body.

Detective Wooten then took the stand on behalf of appellee. He testified that he interviewed the victim while she was at Grant Hospital. When asked to describe her at that time, Detective Wooten stated: "She was visibly upset. She had injuries to her face and neck." (Tr. at 189-190.) He stated that she gave a physical description, a cell phone number, and a description of the car. In essence, Detective Wooten gave a less detailed version of the testimony he had given at the suppression hearing regarding his research through the cell phone company, his encounter with a man he identified as appellant, and his observation of a car matching the description the victim gave. He also testified regarding the photo array, including his interaction with the victim about the photos. He

again confirmed that she looked at the array and picked out appellant within "a couple of seconds." (Tr. at 205.)

On cross-examination, Detective Wooten stated that he had checked Motel 6 registrations for "Thomas Alfred," but not for appellant; he had not checked with Central State College to see if appellant was a student there; and he had not obtained a warrant to search for the victim's cell phone.

Following this testimony, appellee rested. Appellant moved for acquittal under Crim.R. 29, based largely on lack of proof that the alleged crime occurred in Franklin County. The court overruled the motion. Appellant presented no evidence on his own behalf.

Following deliberation, the jury found appellant guilty of rape and abduction. The court sentenced appellant to eight years imprisonment on the rape count and three years on the abduction count, to be served concurrently. The court issued the judgment entry on April 26, 2006.

*State v. Albert*, 2006 3775879 (Ohio App. 10th Dist. December 26, 2006). Petitioner filed a

timely appeal. He asserted the following assignments of error:

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS [THE VICTIM'S] PRETRIAL AND IN-COURT IDENTIFICATION OF THE APPELLANT THEREBY DENYING APPELLANT HIS RIGHTS AS GUARANTEED BY THE FIFTH AMENDMENT.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED BY ADMITTING HEARSAY STATEMENTS IN VIOLATION OF THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE.

ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE
APPELLANT BY REFUSING TO PROVIDE AN IMPARTIAL
JURY.

*See id.* On December 26, 2006, the state appellate court affirmed the judgment of the trial

court. *Id.* On May 16, 2007, the Ohio Supreme Court dismissed petitioner's subsequent

appeal. *State v. Albert*, 113 Ohio St.3d 1514 (2007).

On September 13, 2007, petitioner filed the instant *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. 2254. He alleges that he is in the custody of the respondent

in violation of the Constitution of the United States based upon the following grounds:

> 1. Photographic arrays become unduly suggestive and
> unreliable under the totality of the circumstances when they do
> not accurately portray the skin tone of a previously described
> assailant.
>
> 2. The Sixth Amendment to the U.S. Constitution require[s] an
> impartial jury which cannot therefore include professional
> colleagues of the only expert witness used in the prosecution
> of the matter.
>
> 3. The Sixth Amendment to the U.S. Constitution declares the
> excited utterance exception to the hearsay rule cannot apply to
> statements wherein the proponent has had ample opportunity
> to reflect.

It is the position of the respondent that petitioner's claims are without merit.

**CLAIM ONE**

In claim one, petitioner asserts that he was denied a fair trial due to admission of an

unduly suggestive and unreliable identification. Specifically, petitioner asserts that the

alleged victim's in court identification of him as her attacker was impermissibly unreliable because she identified him from an unduly suggestive photo array shown to her approximately two months after the alleged incident. Petitioner complains that the alleged victim had described the perpetrator as a light skinned black male, which does not match his skin tone. He further contends that the photographs shown to the alleged victim were in black and white, and therefore did not accurately depict skin tones. *See Petition.* The state appellate court rejected this claim as follows:

> In his first assignment of error, appellant asserts that the court erred by failing to suppress the victim's pre-trial and in-court identification of appellant. We disagree.
>
> When considering a motion to suppress, the trial court assumes the role of the trier of fact and, thus, resolves questions of fact and evaluates witness credibility. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. As such, we accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* However, we independently determine as a matter of law whether the facts meet the appropriate legal standard. *Id.* In this regard, we apply de novo review to the trial court's application of the law to the findings of fact. *State v. Zax-Harris,* 166 Ohio App.3d 501, 2006-Ohio-1855, at ¶ 8.
>
> Here, appellant moved to suppress the victim's identification of him on grounds that the photo array procedure was impermissibly suggestive. In order to determine the admissibility of a pre-trial identification, a court must engage in a two-step analysis. *Neil v. Biggers* (1972), 409 U.S. 188, 196-197. First, a court must determine whether the identification procedure was impermissibly suggestive. Second, if the procedure was impermissibly suggestive, then a court must determine if there was a " 'very substantial likelihood of irreparable misidentification.' " *Id.* at 198, quoting *Simmons v.*

*United States* (1968), 390 U.S. 377, 384. As to the latter point, the factors to consider in determining whether identification testimony is reliable include: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness' attentiveness; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Biggers* at 199-200. The corrupting effect of any suggestive identification procedure must then be weighed against these factors. *Manson v. Brathwaite* (1977), 432 U.S. 98, 114.

 A defendant has the burden of proving that the identification procedures were suggestive and that the identification was unreliable. *State v. Merriman,* Franklin App. No. 04AP-463, 2005-Ohio-3376, at ¶ 16, citing *State v. Green* (1996), 117 Ohio App.3d 644, 652-653. If the defendant does not satisfy his burden to prove that the procedures were suggestive, then the court need not address the likelihood of irreparable misidentification. *Id.*

Here, we agree with the trial court that appellant failed to prove the photo array was impermissibly suggestive. Detective Wooten testified that he followed standard procedure for creating the array. The six photos in the array were of individuals with physical characteristics similar to appellant; thus, appellant's photo did not stand out from the others. The detective testified that he did not tell the victim that appellant's picture was one of the photos, and the form instruction given to the victim confirmed that appellant "may or may not" be included in the line-up and stated that she was "not required" to choose any of the photos. (Tr. at 17.)

But even if we were to conclude that the procedures were suggestive, we still would find no likelihood of irreparable misidentification. Rather, the totality of the circumstances indicates that the identification was reliable.

The morning after the alleged rape, the victim gave Detective

Wooten a physical description. That description matched the individual residing at the address the detective found through the cell phone company, and it also matched the person to whom the car outside appellant's address was registered. Once Detective Wooten showed the photos to the victim, she needed only a couple of seconds to identify appellant. Finally, and perhaps most importantly, the victim spent a significant amount of time with appellant. She met him on November 4 during daylight hours and apparently spent several hours with him, including time in his car and while at the college. The following evening, she went to a movie with him and then spent time with him in the motel room. Although appellant takes issue with the victim's description of him as "light skinned," the victim had no difficulty in identifying him in the photo array or in the courtroom, and she even told Detective Wooten that she was "very certain" of the identification. (Tr. at 19.)

Finally, we do not agree with appellant that the detective's "confirmation" of his identity created an unreliable in-court identification. While the detective shared some details of his investigation with the victim, he did so only after she had identified appellant as the attacker and she had given his physical description. Again, the totality of the circumstances indicates that the victim's identification of appellant was reliable. Therefore, we overrule appellant's first assignment of error.

*State v. Albert, supra.*

The state court's decision is binding on this Court unless that holding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Additionally, the state court's factual findings are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). Petitioner has failed to meet this standard here.

Identification testimony based upon a pre-trial procedure that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a criminal defendant's right to due process. *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir. 1986), quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968); *see also Stovall v. Denno,* 388 U.S. 293. "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers,* 409 U.S. at 198. A court must first determine whether the pre-trial identification procedure employed was unduly suggestive. *Ledbetter v.*

*Edwards,* 35 F.3d 1062, 1070-71 (6th Cir. 1994). If so, that Court must then consider the totality of the circumstances in order to determine if the identification is nevertheless reliable. *Id.,* at 1070, citing *United States v. Hill,* 967 F.2d 226, 230 (6th Cir. 1992); *Neil v. Biggers, supra,* 409 U.S. at 199-200; *Thigpen v. Cory, supra,* 804 F.2d at 895. In making this determination, the Court must consider the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Ledbetter v. Edwards, supra,* 35 F.3d at 1070, citing *Manson v. Brathwaite,* 432 U.S. at 114; *Neil v. Biggers, supra,* 409 U.S. at 199-200. Here, as discussed by the state appellate court, the alleged victim met petitioner the day before the alleged incident and spent a significant amount of time with him prior to the incident. *See Transcript*, Vol. I, at 67-74. Under these circumstances, the totality of circumstances indicates that the victim's identification of petitioner as the perpetrator was not unconstitutionally unreliable.

Claim one is without merit.

## CLAIM TWO

In claim two, petitioner asserts that he was denied a fair trial due to juror partiality. Specifically, petitioner asserts that the trial court permitted a juror who had previously worked with prosecution witness Kathy Malthouse, the nurse who examined the alleged victim, to remain seated on the jury. The state appellate court rejected this claim as follows:

19

[A]ppellant asserts that the jury was not impartial. His argument centers on his challenge to "Juror No. Six." (Tr. at 132.) That juror disclosed that he had worked in the emergency room at Riverside Hospital and knew Malthouse, the nurse who testified as an expert in forensic sexual assault examinations. Specifically, the juror stated that he knew Malthouse "[q]uite well." (Tr. at 134.) They had worked together while he was an undergraduate nursing student; she trained student nurses. They worked together over a period of "[a] couple years" and "once or twice a week maybe, if that." (Tr. at 135-136.) Sometimes the training sessions were just between the two of them, and sometimes Malthouse taught or supervised a group of students that included the juror. The juror stated that he did not know Malthouse socially, did not know her last name, and did not see her outside of work or work functions. This work with Malthouse occurred more than ten years prior to the trial.

Appellant argues that the juror demonstrated bias by indicating that he would tend to agree with her expertise. In particular, appellant notes the juror's statement: "I know she knows what she's talking about as far as a medical standpoint." (Tr. at 139.)

R.C. 2313.42 provides "good causes for challenge to any person called as a juror[,]" including a juror's disclosure "that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." R.C. 2313.42(J). In *Berk v. Matthews* (1990), 53 Ohio St.3d 161, the Ohio Supreme Court held that the determination of whether a juror should be disqualified "is a discretionary function of the trial court. Such determination will not be reversed on appeal absent an abuse of discretion. (*Maddex v. Columber* [1926], 114 Ohio St. 178, 151 N.E. 56, approved and followed.)" *Berk* at syllabus.

Here, the trial court questioned the juror extensively about his former relationship with Malthouse and about his ability to be fair and impartial. The statement identified by appellant as indicating the juror's bias arises from appellant's counsel's questioning, as follows:

[APPELLANT'S COUNSEL]: Well, do you tend to, because of your personal knowledge of her, will you tend to agree with what she says on the witness stand just because of your knowledge * * * of her?

Juror No. Six: Would I agree with her expertise on the certain matter?

[APPELLANT'S COUNSEL:] Just because of your having known her.

Juror No. Six: I believe she's a knowledgeable nurse. She's been there for years. I mean, that's about all I can say. I know she knows what she's talking about as far as a medical standpoint.

(Tr. at 138-139.)

We note, however, that the court thereafter also questioned the juror further, as follows:

THE COURT: * * * Would you automatically believe that Kathy, the nurse that's giving testimony, based upon your professional relationship with her or would you be able to or would you feel it would be reasonable for you or possible for you to judge her credibility the same as you would for any other witness? In other words, if she made a mistake would you recognize it and be able to act upon it?

Juror No. Six: Yes. Yes, I would.

(Tr. at 140-141.)

Based on our review of the record in this case, we conclude that the court did not abuse its discretion by refusing to excuse Juror No. Six from the jury. Based on the juror's responses to the court's questions, it was reasonable for the court to conclude that, despite the juror's prior professional relationship with the witness, the juror would be fair and impartial. Therefore, we overrule appellant's third assignment of error.

*State v. Albert, supra.* Again, the factual findings of the state appellate court are presumed to be correct. 28 U.S.C. §2254(e). Habeas corpus relief may be granted only where the state court's decision is contrary to or an unreasonable application of federal law or based upon an unreasonable determination of the facts. 28 U.S.C. §2254(d). The record fails to support such a conclusion here. *See Williams v. Taylor, supra.*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a .... trial, by an impartial jury .... [and] to be confronted with the witnesses against him...." *Parker v. Gladden,* 385 U.S. 363, 365 (1966), citing *Kirby v. United States,* 174 U.S. 47, 55, 56 (1899); *Pointer v. Texas,* 380 U.S. 400 (1965); *In re Oliver,* 333 U.S. 257, 273 (1948). "The defendant's right in a criminal case to receive a fair trial by a panel of impartial and indifferent jurors is a basic requirement of due process." *Mays v. Chandler,* 2007 WL 2903212 (E.D. Ky., September 28, 2007), citing *United States v. Rigsby,* 45 F.3d 120, 122 (6th Cir. 1995)(citing *Irvin v. Dowd,* 366 U.S. 717, 721 (1961)). However,

> [i]n determining whether a juror is biased, the habeas court must give deference to the trial judge who sees and hears the juror, and the trial court's finding of juror impartiality is entitled to a presumption of correctness. *Bowling v. Parker,* 344 F.3d 487, 519 (6th Cir. 2003). In reviewing the trial court's decision, the question is not whether the trial judge's conclusion of impartiality was right or wrong, but whether the decision was fairly supported by the record. *Id.*

*Montgomery v. Bagley,* 482 F.Supp.2d 919, 948 (N.D. Ohio 2007). A trial judge's determination of a juror's impartiality is a finding of fact subject to deference in federal habeas corpus absent clear and convincing evidence otherwise. *Patton v. Yount,* 467 U.S.

1025, 1031 (1984). Petitioner offers no evidence to rebut the state court's conclusion that Juror No. 6 could judge the credibility of Malthouse as the juror would every other witness and remain a fair and impartial juror in this case. Further, a juror's "incidental relationship" with a prosecution witness or the fact that a prospective juror knew a participant in a trial, including the prosecutor or police, does not result in a violation of a defendant's right to a fair and impartial jury "where the jurors indicated that these relationships would not influence their evaluation of the testimony or their impartiality." *Dell v. Straub*, 194 F.Supp.2d 629, 656-57 (E.D. Michigan, February 28, 2002), citing *United States v. Abuhouran*, 162 F.3d 230, 234 (3rd Cir. 1998); *United States v. Nururdin*, 794 F.Supp. 277, 281 (N.D.Ill. 1992), *United States v. Beasley,* 48 F.3d 262, 266-267 (7th Cir. 1995); *United States v. Frank,* 901 F.2d 846, 849 (10th Cir. 1990). "The constitutional requirement of impartiality is satisfied if the jury is 'capable and willing to decide the case solely on the evidence before it.'" *Lawson v. Jackson*, 2005 WL 1406101 (S.D. Ohio, June 15, 2005), quoting *Smith v. Phillips,* 455 U.S. 209, 217 (1982). The record in this case does not establish that petitioner's constitutional right to an impartial jury was denied.

Claim two is without merit.

## CLAIM THREE

In claim three, petitioner asserts that he was denied a fair trial by the admission of hearsay testimony by Officer Mays. The state appellate court rejected this claim as follows:

> [A]ppellant argues that the court erred by admitting hearsay statements. Specifically, he argues that the court should not

have allowed Officer Mays to testify about what the victim told him. We disagree.

Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, under Evid.R. 803(2), the hearsay rule does not exclude the admission of an "excited utterance," which is defined as: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

The excited utterance exception "'derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated. McCormick, § 297 (2d ed.1972).'" *State v. Taylor* (1993), 66 Ohio St.3d 295, 300, quoting Staff Note to Evid.R. 803(2).

The Ohio Supreme Court has established a four-part test for determining the admissibility of an excited utterance. Under that test, a statement may be admissible where a trial judge reasonably finds:

" * * * (a) [T]hat there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or

the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." * * *

*Taylor* at 300-301, quoting *Potter v. Baker* (1955), 162 Ohio St. 488, paragraph two of the syllabus.

Appellant argues that too much time elapsed for the victim's statements to Officer Mays to constitute excited utterances. In *State v. Duncan* (1978), 53 Ohio St.2d 215, the Ohio Supreme Court held that the passage of two hours from the time of the offense to the time of the statements at issue was not determinative and did not prevent the admission of those statements. The court stated: "[I]n our opinion each case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation." *Id.* at 219-220.

Here, appellant's last contact with the victim was when he left her, bloodied, in the early morning hours in a strange neighborhood with a shirt over her head after being raped. At that time, she knocked on doors until she arrived at the Sinclair household. Sinclair testified that the victim arrived at their home at 3:30 or 4:00 a.m., and that she appeared "dazed or stunned [.]" (Tr. at 125.) When asked whether, "[b]y dazed or stunned, you mean disoriented or more of a shocked[,]" Sinclair stated: "More of a shocked definitely." *Id.*

The victim spoke to Officer Mays approximately three-and-a-half to four hours later, at about 7:30 a.m. Officer Mays testified that she "was kind of hysterical in her behavior." (Tr. at 57.) She "wouldn't quit shaking, her hands were shaking, her face was shaking. She kept clenching her hands. She was crying." *Id.* She knew where she was, "but she didn't know how she got there [.]" *Id.* And it took 10 or 15 minutes to get the information from her.

The lapse of a few hours between the time appellant left the victim and when she spoke to Officer Mays is significant. As appellant suggests, "as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance." *Duncan* at 219, citing McCormick on Evidence (2d Ed.1972) 706, Section 297.

On the facts of this case, however, we cannot conclude that the court abused its discretion by admitting the statements. "Evid.R. 803(2) creates a factual question as to whether the declarant is still under the stress of excitement caused by the rape when she makes her statements." *State v. Smith* (1986), 34 Ohio App.3d 180, 190. Addressing the application of the excited utterance exception to a rape victim's statements made 30 to 45 minutes after the assault, the Fifth District Court of Appeals stated, in *Smith*:

* * * Rape often produces a psychological trauma to the victim which may leave her in an excited emotional state for hours after the attack. She may also remain silent and subdued immediately after the rape in order to effectuate a successful escape from the rapist or hostile environment. The victim may reasonably believe that she is not safe or secure enough to express any suppressed excited statements until she reaches a safe destination, usually her home. During her trek home, the victim may well be still in the emotional throes of the traumatic event, incapable of reflection and contemplation. The state of her emotional condition under such circumstances is a factual question.

*Id.*

Here, while appellant argues that the victim did not appear to be in a state of excitement while at the Sinclair home, Sinclair testified that she appeared "shocked[.]" (Tr. at 125.) It was not unreasonable for the court to conclude that the victim was still in an emotional state when she spoke to Officer Mays shortly after reaching a safe location, Arnold's home. There was evidence that the attack upon the victim was startling enough to produce a nervous excitement and that it was sufficient to

still her reflective faculties. The evidence of the victim's behavior at the time Officer Mays spoke to her is sufficient to support a finding that her nervous excitement still dominated and that her statements were more excited than reflective. And, while the court expressed some concern about getting too far from these excited utterances, appellee limited Officer Mays' testimony to what the victim relayed during the 10 to 15 minutes it took to get the information and while "[s]he was still pretty hysterical." (Tr. at 64.)

We note, too, as appellee argues, that the victim's statements also explained why Officer Mays called in a supervisor and took the victim to the hospital. To the extent the statements were admitted to explain his actions, they were not admitted for the truth of what the victim stated and are admissible. *See State v. Harris,* Franklin App. No. 04AP-612, 2005-Ohio-4676, at ¶ 20 (statements offered to explain officer's conduct are not hearsay).

Appellant also argues that the court's admission of Officer Mays' testimony violated his right to confront witnesses pursuant to *Crawford.* As the trial court concluded, however, *Crawford* did not apply to preclude the testimony because the victim testified. *Crawford* at fn. 9. In addition, " *Crawford* only applies to statements that are, in fact, hearsay," and not subject to exceptions to the hearsay rule, such as excited utterance. *State v. Banks,* Franklin App. No. 03AP-1286, 2004-Ohio-6522, at ¶ 18.

For these reasons, we conclude that the trial court did not err by admitting Officer Mays' testimony, . . .

*State v. Albert, supra.* Again, petitioner has failed to establish that the state court's decision is unreasonable so as to warrant federal habeas corpus relief. 28 U.S.C. §2254(d), (e); *Williams v. Taylor, supra.*

Petitioner apparently complains of the following testimony by Officer Richard Mays:

Q.  What was she able to tell you... about what had occurred?

A.  She explained that she'd been sexually assaulted and that she knew the person's name, Mr. Alfred[,] and she explained where it happened at, to the best of her knowledge it was a Motel 6.  She didn't know the exact location of it.  She went to the movies at Easton with him prior to that, met him the day before.  She gave me his cell phone number, the kind of car that he had which she described as an old style police cruiser, box cruiser.  And she furthered that when she got to the hotel she explained the incidents that occurred there and how he had attacked her and how she ended up with the injury by him striking her.

Q.  Did she give you a first name?

A.  Thomas Alfred.

*Transcript,* at 59-60.  Mays also testified that the alleged victim had described her attacker as being between five feet nine inches and five feet eleven inches tall, large build, about 214 pounds, 21 years old, and a light skinned black male with a bald or big head.  *Id.*, at 61.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross-examine adverse witnesses at all stages of the trial.  *Illinois v. Allen,* 397 U.S. 337, 388 (1970). In *Crawford v. Washington,* 541 U.S. 36 (2004), the United States Supreme Court held that testimonial statements of a witness who does not appear at trial are inadmissible unless the witness was unavailable to testify and the defense had a prior opportunity for cross-examination. *Id.,* at 1366.:

> Where testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

The Court declined to spell out a comprehensive definition of the term "testimonial," but

stated that, at a minimum, the term includes

> prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* A casual remark to an acquaintance, business records, and statements made in furtherance of a conspiracy do not constitute testimonial statements subject to the strictures of the Sixth Amendment. *Id.,* at 1364, 1367. "Where non-testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does *Roberts* - - and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford v. Washington, supra,* 124 S.Ct. at 1374.

> [T]he proper inquiry in deciding whether a statement is testimonial for evidentiary purposes is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Cromer,* 389 F.3d at 675.

*United States v. Pugh,* 405 F.3d 390, 399 (6th Cir. 2005). Additionally,

> [t]he admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay - in other words, it must be offered for the truth of the matter asserted.

*Id.*

> Prior to *Crawford,* the admissibility of any statement - whether testimonial or not - depended on whether the statement fell under a "firmly rooted hearsay exception or [bore] particularized guarantees of trustworthiness." *Crawford,* 541 U.S. at 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (citation and internal quotation marks omitted); see *Ohio v. Roberts,* 448 U.S. 56, 100

S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion). Thus, "[a]ny out-of-court statement was constitutionally admissible so long as it fell within an exception to the hearsay rule or, if that exception was not firmly rooted, the court found that the statement was likely to be reliable." *Saget,* 377 F.3d at 226 (citation omitted). The leading case standing for this generalized approach to analyzing Sixth Amendment challenges to hearsay evidence is *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which the Court frankly ridiculed in *Crawford* but did not quite over-rule. *See Crawford,* 541 U.S. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (describing pre-*Crawford* confrontation clause jurisprudence as in "doubt" but not definitively overruled). Consequently, with respect to non-testimonial hearsay statements, *Roberts* and its progeny remain the controlling precedents.

*United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005). However, a violation of the

Confrontation Clause is subject to harmless error review. *Id.,* at 400, citing *Jordan v. Hurley,*

397 F.3d 360, 363 (6th Cir.2005).

> Unless a constitutional error has a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), it will be considered harmless.

*Dorchy v. Jones,* 398 F.3d 783, 791 (6th Cir.2005). Here, even assuming that Mays's testimony

violated the Confrontation Clause, the record establishes that any error in admitting his

testimony did not prejudice petitioner and was therefore harmless. The challenged

testimony was merely cumulative to that of the alleged victim. *See Transcript*, at 67-121.

Claim three is therefore without merit.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action

be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matt er to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140, (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).


<u>November 10, 2008</u>                                          <u>  *s/Norah McCann King*        </u>
                                                                       Norah McCann King
                                                                       United States Magistrate Judge